And the first case we have this morning is number 14-1948, InRe Avandia Marketing. And Mr. Bisoner and Mr. Zakharov. Did I pronounce that similarly? Yes. Because the last time I think I screwed it up. Thank you. Good morning. May it please the Court, I'm John Bisoner. I am counsel for Appellant GSK. And Your Honor, if I may, I'd like to reserve five minutes for rebuttal. That's fine. This case presents the question whether the plaintiff health insurance providers have stated a claim under RICO or state consumer fraud statutes by alleging that GSK should have disclosed additional risk information about Avandia. The answer to that question, we contend, is no. Now, why aren't the plaintiffs here the direct victims of the alleged misrepresentation? Why aren't they the plaintiffs? The third-party payers. They are not, Your Honor, because if you're talking about the causation process, it's a very attenuated process before this gets anywhere directly near them. Okay. Let's back up. If they aren't the direct victims, and let's assume for the moment, obviously, you're not conceding that there was some type of misrepresentation or actions over the years that was fraudulent or whatever. Just assume that for the moment. If that was the case, who are the direct victims? If there were misrepresentations over the years, you have consumers who are part of the process, who play a role in making decisions about buying the drugs and are often paying for part of it. And then in some instances, you have third-party payors who are paying for that as well. But the causation in this case is alleged in the complaint, we don't think indicates any direct connection here at all. Let me ask an even more of a background question. The third-party payors, do they reimburse the union members when they get drugs? Do they actually have a pharmacy where they dispense drugs to union members as they're ordered? How does that relationship work? Your Honor, I think that varies depending on the circumstance of the particular vendor. In some instances, the health provider will provide it to them. In other instances, they go to the pharmacy and make the purchase, and then there's a payment that is made by the insurer to the pharmacy for the process. Who goes to the pharmacy, the union member? Yes, the union member would go to the pharmacy for that purpose, Your Honor. The third-party payors are claiming that they are paying more for Avandia than they would pay if the truth had been known. But, I mean, this isn't like diamonds that they're investing in that are worth less than they're sold for. This is not something that the third-party payors are maintaining in a big stock room. It's something that sort of passes through them to the consumer, isn't it? Your Honor, it does pass through to them to the consumer. The methodology by which that occurs varies depending on what the structure is of the health delivery system. If we're trying to figure out how the third-party payors got injured, I just feel I don't understand enough about what their relationship was to the ultimate consumer and what they did, how they maintained supplies of this drug. Your Honor, the normal process is, and I want to be careful because it does vary from instance to instance, but normally the process is that if I'm an insured, I go to the doctor. The doctor looks carefully at what prescription he or she believes that I need, writes the prescription. I take the prescription to the pharmacy. I will sometimes co-pay. I will have to pay for part of that myself, but the insurance company will then pay the pharmacy or the disseminator of the drug for whatever portion of that they're required to pay under the insurance agreement. So it's... How does a third-party payor in the Avandia case get injured then? Well, Your Honor, that's the real question that we raise. Fundamentally, we think this is a nothing happened case. Plaintiffs don't allege that Avandia caused any of their beneficiaries physical injuries or other side effects or that the drug didn't successfully treat diabetes. I want to focus on the pecuniary injury to the third-party payors. How does that happen? Well, Your Honor, what they are alleging here is that had they known the risk information that we allegedly did not disclose, they would have changed the formulary that indicated what prescriptions the doctors could prescribe that they would pay for. The problem with... Third-party payors maintain a list of drugs that the union members can use then? Is that... Yes. They retain PDMs, which are individuals who are charged with monitoring the drug market who then make determinations about what should go on the formulary. The problem with their theory, Your Honor, though, is that in 2007, when they admit in the complaint that the information that they say should have been disclosed earlier was in fact disclosed, they made no change to their formulary at that point. And that's why we're saying... Does the formulary represent drugs that the third-party payors have actually purchased or does it represent drugs that the third-party payor is saying, I will facilitate the acquisition of these to pass on to you? It's the latter, Your Honor. It's a list of drugs that they will pay for if they are prescribed by the physician. And they have, through the PBMs, they have the ability to change and modify that list if they wish to do so. Why can't we distinguish between the post-2007 and pre-2007 situation? We can't distinguish between the two because, if I'm understanding your question correctly, Your Honor, is that it indicates that the assertion that they've made that they would have changed the formulary didn't occur. They're saying that if this additional information would have been made available to them, they would have modified the formulary, but the fact is they didn't do it. And they allowed full compensation for the drug to continue after 2007. Is this something we can consider at this stage or do we have to wait for summary judgment to take that into account? Your Honor, there's no reason to wait to do that because there's no allegation in the complaint. There's an acknowledgment in the complaint that this information became known in 2007 that they allege was concealed. There's no allegation in the complaint that they changed any behavior. And so I think the court should assume that no change in behavior occurred. It's just as in the situation in Mayo at the end of the decision where they say the court needs to make certain assumptions about what happened with this product in the absence of an allegation that obviously should have been there if they had acted consistent with their allegations with respect to the product. So to some extent there may be some overlap between the injury in fact analysis and also the proximate cause or the analysis as well. But on the standing and injury in fact issue, what is your strongest argument on that? Our argument on that is really Mayo controls the situation here. In Mayo, as Your Honor is aware, you had allegations that insurance didn't receive, would not have received if there was a risk that they wouldn't receive what they were promised because of policies of the insurance company that were not disclosed. Mayo is a difference in quality. And here it seems like there's a, there would have been cheaper alternatives. It seems there's more of a cost issue here than there was in Mayo. Well, Your Honor, I don't think that that is correct because what was alleged in Mayo was that the product that they were receiving was an inferior product. And indeed the court. It didn't have the quality that they thought they were getting. That's correct, Your Honor. And the court summarized it by saying we think it's fair to characterize appellant's injury theory as bottomed on the notion that Aetna's policies render its HMO structure bad in comparison to what other insurance companies offer in the marketplace. So it's exactly what we're talking about here. And I would note that one of the key cases the Mayo court relied upon is the Eighth Circuit's 1999 decision in Brielle which in a nutshell held, and I'm quoting, when is in this case a product performed satisfactorily and never exhibits an alleged defect, no cause of action lies. That's what we're talking about here. They're saying we weren't told of risks about this product, but none of those were manifested with respect to our insurance. Did the district court distinguish Mayo or deal with Mayo? Your Honor, it mentions Mayo, but it really did not distinguish it and went off on cases from other circuits. That's our primary concern here is that it really didn't deal with the holding in Mayo. And I would note that the Horvath decision as well, it's a non-RICO case, but it deals with Article III standing, similarly held that the allegation that there was a risk that the insurance in that case would not receive the benefits to which they think they were entitled was far too speculative to serve as a basis for the claims that were being asserted. Warfarin is a non-RICO case as well, the one from our circuit that was decided about ten years ago, I guess. But for the fact that that is a non-RICO case, how is it really different? Your Honor, I think that Warfarin is distinct in a number of respects. First of all, you need to keep in mind that was a case reviewing a class action settlement. And it was an antitrust case, non-RICO. Indeed, in Warfarin, they distinguish product liability type cases as being in a different category. That's what we're talking about here are risk cases. My claim was that DuPont had put out misleading information that their generic Warfarin drug was in fact was less safe and chemically different from Coumadin, right? That's right, Your Honor, and it was a generic exclusion case, which I think is very different than what we're talking about here, which is a non-disclosure of risk case. That's an antitrust injury that we're talking about in that case. Here we're talking about RICO. Like you mentioned the non-RICO case, I guess Horvath or whatnot. I mean, the question here is by analogy, when you say in that case that you could have third-party payers had standing because they suffered direct economic injury. How is that different from the third-party payers here claiming that they suffered direct economic injury? Well, Your Honor, it's an antitrust case. I think that the theory of injury there, of competitive injury, would be broader, as Judge Chesler pointed out in the district court decision in the Shearing Plough case, and which an analysis that this court in its appeal, even though that focused on other standing issues, said it agreed with. But I think, Your Honor, it's also important to note that was a review of a class settlement, and so the court in part said, look, DuPont is including these individuals, the TPPs, in this settlement, and they're paying more money to do it, so why should we worry that much about the standing issue in this case? I don't think it's directly on point. Well, why not follow up in the Second Circuit what they did in Desiano or the First Circuit in the Narantan case? Well, Desiano is, Your Honor, a very different case. Our position here is that under MIO, in order to state a claim under RICO, you have to assert that the drug is either ineffective or poses a safe. Those are the two problems. There is a claim here that it's unsafe. No, Your Honor, it's not unsafe in the sense that we're talking about. You have to go to the Ironworkers case for a full explication of that, which based on MIO says that what you're talking about there is if physicians, consistent with sound medical practice, would not prescribe the drug. Here, the FDA never took this drug off the market. It remained on there the entire time, and indeed, at this point, the warnings that plaintiffs are saying should have been made earlier, the FDA has taken off the product. And so we're not talking about unsafe in the same sense that we're talking about here. But once you get through arguing MIO, there is still a claim I agree that the plaintiffs are making that they suffered direct economic injury. I have no problem considering MIO and its implications, but there's that additional claim the plaintiffs are making that I think you need to spend more time addressing. Well, Your Honor, we don't think the allegations are there at all in the complaint of a direct economic injury. It simply is not there. They don't make any allegation about what drug they would have, would have been provided if they had changed the formulary. They talk about less expensive metformin, but the complaints also indicate that that drug, that Avandia would not have been used in the circumstances for that as a substitute. Avandia is a third or fourth level drug if those initial drugs are not effective. They're also arguing, as I read it, I think, that they are paying more for Avandia than they should. And that is an injury to them. Well, but Your Honor, if you look at the complaint, that allegation really isn't there. Because they say there were lower cost drugs, but they're not fungible, the Avandia. If you have to have Avandia, it's because those cheaper drugs are not effective. The only alternative drug that they mention is Actos, but there's no allegation that that's a less expensive drug. Maybe Avandia would have sold at a lower price if the truth had been known. Isn't paying that additional price part of the injury that the plaintiffs are alleging? Your Honor, that is not really what they are alleging here. They are talking about a substitution of products. They're nodding their heads like, yeah, man, go ahead. No, Your Honor, the allegation in the complaint is that they would have used less expensive drugs, but there's allegations in the complaint that are inconsistent with that. I'd like to hear from you before we close, with our presider's permission, on the causation issue. Like I'm going to say no. Your Honor, and also the effect of the doctor prescribing and also the fact that after 2007 there was a diminution of use of prescriptions in this area. Maybe that's not appropriate at this time, but the causation issue with both RICO and the consumer protection laws, the foreseeability issue, the directness issue as well. Well, Your Honor, with respect to but-for causation, plaintiffs offered two theories. One is that GSK's conduct caused them to include Avandia on their fair formularies and to cover it, and they also allege that the conduct caused more doctors to prescribe Avandia, costing them more money. The main thing I would note is if you look at the complaints, and together all three of them comprise 213 pages, but there's only a page or two that actually talk about injury and causation, and they don't speak in the first person. They don't talk about these particular named plaintiffs in these cases having been exposed to any of the misrepresentations or that these effects, Your Honor, referencing downward levels of prescriptions or whatnot, that they experienced that. And as I mentioned in response to Judge Roth's question, they don't provide any indication that they actually suffered economic injury. They say that these older standing products would have been prescribed, but that's inconsistent with the complaint saying that Avandia was reserved for circumstances when metformin and products like that were not effective. And then they say, well, it might have been Actos would have been prescribed, but the Actos, there's no allegation in the complaint that that was a cheaper product. And so the allegations of but-for causation are incomplete there. And proximate cause? And proximate cause, Your Honor, we believe that under steam fitters, it's just simply it's a very attenuated process. We don't think that consistent with Holmes and subsequent decisions of the Supreme Court on proximate cause that there is a sufficiently direct link. They're basically saying that, and again, this is. What does direct mean in your view? Direct means what Hemingward said. It's really a first step. It's a one-step process. And this is a very attenuated. What does that mean? I mean, what does direct mean? Direct, I think, it's got to be. But for the violation, there wouldn't be an injury, right? Well, no. That's really talking about but-for. Proximate cause is how many steps are in the process. And what they're saying here is that misrepresentations were made, that that affected the medical literature, that the TPPs relied on that medical literature. They don't say that as themselves, but they say generally TPPs would have, that doctors or patients may have relied on that literature. But then you have the individual independent medical judgment of the physicians who may not have even looked at any of that literature, who in assessing the circumstances of that particular patient may have decided this was the best product for them. And so if you're talking about having to figure out what additional amount was paid because of these misrepresentations, that's an individual case-by-case analysis that has to be engaged in because there are so many independent circumstances here that may influence the outcome. But Desiano didn't seem to have a problem with that, did it? Well, Your Honor, I think that Desiano, first of all, is a very different case because there the product was withdrawn from the market. Now you're getting back to the circumstance I was talking about earlier where a physician using sound medical judgment would not have been prescribing that physician. So that makes the analysis I'm just talking about much easier and much less attenuated. Is Hemi's declaration sufficient for us to rely on? Or is it too fractured an opinion? Hemi. I think, Your Honor, what is being summarized there is that foreseeability, which is plaintiff's fundamental theory, should not be the basis. That's what steam fitters rejected as well. And I think what Hemi is saying is that looking back at prior decisions of the court, foreseeability has not been part of the analysis. Thank you, Your Honor. Mr. Isakroff. May it please the Court, Samuel Isakroff for the plaintiffs. I think that following the Supreme Court's instruction in Holmes that there are two questions before the court. One is whether but-for causation is sufficiently pled or injury in fact is sufficiently pled, and the other is the proximate cause question. Just to get a little background, what is the causal chain that you have here? The causal chain is as follows. Most Americans do not pay for prescription drugs or only pay a small copay. So, for example, with these third-party payers, the average copay is about 10%. So 90% is paid by the insurer, whoever the insurer might be. In the United States, about 45% of the population that takes prescription drugs is insured privately. About 55% is on the government side. The government has, since the time these complaints were filed, has independently brought criminal charges against GSK over the very events in question here, and the settlement between GSK and the government, which included a plea to a criminal charge and forfeiture civil penalties, amounted to $2.4 billion, the second largest such payment by a drug company in American history. About $240 million of that was the criminal side on Avandia, which is exactly equal to the Narantan amount, and the rest, about half a billion dollars, was civil penalties attributable to this. Let's go back to the chain. So you've got GSK, and then you've got sort of running through the pharmacy benefit managers making a decision as to whether something goes on a formulary. That's correct. Then you have patients going to a doctor, the doctor writing a prescription, and the patients go to the drugstore. They get it, and the insurer pays for it. That's correct. That's correct. And obviously, if that's the case, then one, you know, 11th Circuit and others, a lot of district courts have said when you go to the doctor, knowing the information, especially since 2007 since you had the Nissen report, that cuts the causal chain. Your response to that would be? Well, there's two parts to the question, Judge. The second part I'll deal with first, which is the post-2007, pre-2007. On this score, I think that it's premature to address that at a motion to dismiss stage. That's a factual question. Whether or not there were changes and what the changes might have been and whether there were other reasons that Avandia sales dropped, did not drop, these are the kinds of factual issues that I don't think this court has ever addressed on a motion to dismiss at this stage. But leaving aside the 2007, the real question in this case on the proximate cause side is the division between the 1st and 2nd Circuits on the one hand and the 11th Circuit in the steamfitters case and there's a lot, I'm sorry, the ironworkers case. Ironworkers. Yeah, steamfitters in this court. The ironworkers case, which is a significant division. If I can address that. But the 11th Circuit is saying that when you go to the doctor and the doctor has this information, the doctor still makes the call and that really takes it out of any proximate causation. Well, the 11th Circuit said much more than that. The 11th Circuit said that the fact that these are insurers who pass on the costs means that they are not in a position to enforce the laws here. And I think that gets to the heart of the inquiry because if this were an antitrust case, there's no question that the holding of Warfarin is directly on point. And I'll just quote from Warfarin, TPPs suffered direct economic harm when, as a result of misrepresentation, they paid super competitive prices instead of purchasing lower-priced generics. TPP meaning third-party payers. Third-party payers. So it's exactly the same category of people. There's no question under Warfarin that if this were an antitrust case, this injury is cognizable. And, in fact, in Warfarin, the court cited with approval and quoted with approval for its holding from Desiano, which also gets to the state consumer case side of this. Mr. Beiser says because this is a RICO case, it's to be analyzed differently. Well, that's an interesting question, Your Honor, because if we go back to Holmes, where the court first sets out what the theory of RICO harm is, it says the way we construe it is by reading the language of the statute. The language of the statute is identical to the same formulation in the antitrust laws, and the court goes through with great care to try to figure out what from the antitrust laws can be imported, including the idea that the harm is defined as those people who actually paid the money, that that's what the direct causal link is. And if you took the Eleventh Circuit opinion by Judge Choflat on its face and applied it to antitrust, you would find the whole Illinois brick doctrine would be thrown out the window because there, too, you have direct purchasers who pass along the price to others. But as the court described in Bridge, for example, which went unmentioned in the first part of this argument, we want to put the incentives to sue on those who can enforce the laws against wrongdoing. And here... But isn't there a larger chain here, or a greater chain, in the decision-making than there was in Warfarin? I don't believe so, Your Honor. I think that in Warfarin there was collusion to prevent the sale of generic drugs, and in Warfarin the settlement was premised on the idea that the third-party payers paid excess. And it's the only people who are affected, the only place that money comes out of a pocket effectively, except for this 10 percent residual, is from the third-party payers. It's instructive that in Narantan you had Justice Souter sitting on the panel who wrote both Twombly and Holmes and found that that case fits squarely within the application of the doctrine, both in Twombly and in Holmes. And so you'd have to have... I think it would be impossible for this court to grant a 12b-6 on either proximate cause or but-for without declaring that the case that went to trial, to judgment, appeal, cert denied in the First Circuit, had to have been thrown out on the pleadings as a matter of law. There's no space between them. And the only way that you can get around Warfarin in this court's precedent, which is a case I think directly on point, is by finding a distinction between the antitrust laws and RICO. And if you go back to Holmes, what you find is that the entirety of the Supreme Court's analysis is predicated on the comparison between the two lines of authority and to say that the statutory language is the same and the statutory intent is the same to enable private enforcement of the laws in question. In the remand of the Bridge case to the Seventh Circuit, there's a line from Judge Posner, which is quoted in the Narantan case, saying, the doctrine of proximate cause protects the primary victims of wrongful conduct to obtain compensation. That idea of the primary victims is a very simple one, I would submit. It's one that's basically the deep throat admonition, follow the money. The object of this conspiracy was to get money into the hands of GSK. That's what's alleged here. That's what the nature of the criminal indictment was. That's what the congressional findings were. And there's only two sources for money in our health care system for prescription drugs. One is the federal government, and that's already been resolved for almost a billion dollars. And the other one is the private parties, because the private parties are the only ones who pay meaningfully. And that's the structure of our health care system. There's all sorts of oddities in our health care system, as we are all aware that there's a disconnect between who makes the decisions and who pays. But the critical decision for a drug company is whether or not these drugs appear on the formulary and at what level of remove from the consumer decisions. How would you prove damage as a trial here? You would prove damage as a trial in a couple of ways. One is by showing that there were more prescriptions sold than there would have been of this drug. And I think that Mr. Beisner does not read the complaint fairly when he says that we don't, that there is only the use of this second or third generation drugs when the first generation drugs has failed. The complaint alleges that there was active marketing of early intervention with these drugs, and that so there would be a distinction in the quantity sold and also where on the formulary. The ability to place it higher up, Judge Roth mentioned the superior pricing, the ability to put it higher up on the formulary scale means that you get a higher price for it. And they may very well not have gotten that higher price or not have gotten the higher volume that followed from its preferential status in the formulary. How do you define the third party payers' property interest? The third party payers' property interest is the oldest one known, which is money. It's their money. And there is no case that has found that when the money comes out of your pocket on a fraudulent basis that there is no harm there. That's cognizable. It's very difficult to have a standing case. For example, in Mayo, this court said you got what you paid for. Now, that it might not work as promised down the road, well, maybe you'll have a case then. Maybe you'll have a claim then, but it's giving you exactly what you paid for at this time, and so there is no possible harm. Here, the money came out of the pockets of my clients. It's their money that was put in the pockets of GSK, just as it was the government's money that was put in their pockets on the criminal, civil side that the government brought. It's exactly the same case. What's the principal substitute for Avandia? Well, there's several. Isn't it Actos? Actos is the primary one in the second, third generation of these drugs. That's correct. You admitted the price, or whoever drafted the complaint admitted the price from the complaint, right? We are not alleging that Actos was cheaper than Avandia. Okay. So then you have to go to the other two primary substitutes. That's right. You have to go to the first generation, and our claim is that there would have been less promiscuous use of the advanced drugs, as in fact happened after 2007 when the warnings became known. And that's a factual question that obviously can't be resolved at this point, and I don't think that collectively Mr. Beiser and I are the leading authorities on the workings of these drugs. How do you explain that part of the complaint that says that it was the actions of GSK, both in their advertising and perhaps in maybe some strong arming as well, that kept the doctors either misinformed or in line on all of this, when in fact Dr. Boos and Dr. Nissen were able to, through their own sources of information and studies that were done, were able to come up with the reports that they did? So is that really to what extent do you rely on that? We rely on that completely, Your Honor. I think that the fact that some independent researchers did independent research as opposed to drug company-sponsored research is all to their credit. What happened afterwards, which included acts of intimidation, attempts to drive them out of the business, threats against them of different kinds of defamation actions and so forth, is an indication of exactly the kind of conduct that RICO is intended to prohibit. And I think that that conduct, which granted it was done by independent researchers, but the response from GSK of trying to keep relevant information from the market and failing to discharge their obligations to the patient population that used their drugs, was the basis of the congressional hearings and ultimately the basis of the federal indictment. Exactly the same conduct. They don't get a pass because some independent researcher came upon the information. And certainly, again, we are at a 12B6 stage. It may turn out that they had, when we get discovery, that they had even more significant information in their files that we haven't seen access to yet, that we haven't had access to yet. So I don't think that that issue is properly before the court at this point. The allegation is simply that they suppressed information from the medical population. Now, in terms of the TPPs themselves, Mr. Beisner said, well- Can I just interrupt you on that? Sure. Your complaint said that GSK exclusively controlled the information that it put out, and yet after 2007, or by 2007, you had the Nissen-Wolski report, which said that there are studies that puts into play a bandia's risk. So how do you reconcile those two, at least as of 2007? After 2007, there's no question that there's more sources of information out there. There's no question about that, and that's a factual issue of whether that cured or relieved GSK of its responsibility. The allegation, the critical allegation, is that in the period leading up to 2007, they obscured information that they had, which should have been revealed, and they did everything possible to cover up information and to prevent its being widely disseminated. The reality is, and perhaps the word exclusively is a bit of poetic license in the complaint, but the allegation is basically that there is only one source that funds drug research, quality drug research in this country, and one source that has the exclusive pipelines for all the research labs in the country, and that's unfortunately, the reality is it's the drug companies. So the obligation is upon them, it must be incumbent upon them to act responsibly, and that's the entire thrust of the complaint, is that they did everything possible to keep this information from the public domain, and again, it would be extraordinary to have a 12B6 granted in the face of a criminal indictment and a plea over exactly the same conduct. If one goes back to Twombly, for example, that's an antitrust action which is unusual among antitrust cases because it's a naked civil action. There is no government... What was the formulary status of Avandia from 1999 to 2007? What was the formulary status? In other words, you had that and you had these other drugs, Actos, Metformin, and the third one whose name I can't pronounce. Right, Metformin, the first generation drugs were the most accessible. They were the cheapest price and they were the easiest to prescribe, and then you had Actos and Avandia and one or two others of the third generation or second, third generation, the terminology changes, but of the next generation drugs that were higher up on the formulary. They were thought to be more effective and they were priced higher. In the Neurontin case, one of the findings of fact, and this is, again, we're at the motion to dismiss stage, but one of the findings of fact that the First Circuit thought was compelling was that there was a high rate of correlation, over 90%, between where drugs were placed on the formulary and physician prescribing decisions. And so the fact of getting a drug moved up to an improper place actually has a big effect, according to the facts in the Neurontin case, on the subsequent physician decisions. And rather than being a learned intermediary that breaks the causal chain, that fact, which was established by record, by expert testimony, by statistical proof, and accepted by the district court, affirmed by the First Circuit, that fact establishes that it is a direct conduit from their sales to the physicians and their representations to the PBMs, the physician benefits managers, and the consequence to our clients who are the people that pay the money. If a pharmacy benefit manager makes a decision as to what goes on to the formulary, can the third-party payer overrule that? It would be very difficult for these third-party payers, the three who are before this court right now. We're not here as a class action. We're here only on a motion to dismiss three individuals. These are small players. They can't realistically make that decision. They follow the advice of the PBMs. The PBMs are the intermediary between medical knowledge and the prescribing capacity of the TPP or the reimbursement capacity of the TPP. So if, for example, the insurers that you represent are paying 90 percent, they can't say to a PBM, we're uncomfortable having our money go out with regard to a Band-Aid. They have that capacity in theory. In practice, they don't because they don't have the internal resources. It sounds odd, but there are tens of thousands. The usual rules, he who has the money makes the rules. Right, but sometimes he who has the money doesn't have enough money to make the rules. And so here there are tens of thousands of these third-party payers. It's something that shocked me when I first learned of it. I assume that it's all Aetna and, you know, big companies that we're used to or I've always dealt with. But it's small shops that deal with, as, for example, Judge Roth mentioned, union pension plans that basically administer an employer-based small amount of reimbursement. They don't have the internal capacity to make medical decisions. They contract that out to PBMs, which tend to be much larger enterprises. Hypothetically, is there anything that would break the causation change with the PBMs? I mean, what if there was outright corruption that they were bribed to... The PBMs. Yeah, to make recommendations on the formulary. Would that make any difference or is the injury still there? I don't think... Is the causation still established? I don't think so, Your Honor. Under this court's decision in insurance brokerage antitrust, which had a small RICO component at the end, the court said that the predicate offenses must be related to the activities of that enterprise in trying to describe the scope of the RICO undertaking. It seems here that the purpose of the enterprise was to get money. So if they bribe somebody, that's money going in the wrong direction as far as the drug companies are concerned. So if they're trying to get money, there's only... I go back to the main point. There's only one place where they can get that money, and that's from the insurance payers because that's the structure of the health care market. And if there were some kind of intermediation where somebody else were paying, that might be a different question. But even in these cases, Judge Roth, the individuals, when they go into the pharmacy, it's not like they pay $100 and then submit a claim for reimbursement. Most often, they go in with their insurance card. So the company, the only people who pay money in these situations, other than the government side, the only people who pay money are the insurance companies. At most, there's a small copay, but the rest is all out of the pocket of the third-party payers. And so when you talk about there's a break in the proximate cause line, I think that this court's instruction in insurance brokerage is to put together the purpose of the enterprise. That's what makes this a RICO case, and there's no challenge here on the enterprise side or any of the objects of it. The core of the activity was to get money out of the hands of the TPPs into the hands of GSK. That's the only purpose of this. That's the only thing that was going on. Once you look at it that way, nothing has to be done directly to the TPPs to make that happen. That can be done indirectly. And bridge, if bridge is good law, which is 9-0 in the Supreme Court quite recently, under bridge, that causal chain doesn't matter that it was directed to somebody else in the first instance, even by a bribe or even by illegal conduct. It's whether the money is intended to come out of your pockets. And if I could have just one more second, if we go, for example, back to the iron workers case from this court, I think that that case is instructive also because in that case the nature of the conspiratorial activity or the allegedly improper activity was to sell cigarettes. So the money was coming from smokers and into the pocket of the tobacco companies. And then you have health insurers coming in and saying, we're victims too. And this court, I think, properly said, now you're moving too far apart. That starts to look like the distance in the ANSA case in the Supreme Court or the distance in the Holmes case in the Supreme Court or the distance in the HEMI case in the Supreme Court, where the improper conduct, the predicate activity, as this court said in insurance brokerage, the predicate activity is directed to somebody else. That's where the money is. And now you have the ricochet effect on. No, I understand. You can distinguish ANSA and Holmes and the last HEMI. But back to Judge Sirica's question, if knowing what you know that there's a problem out there and a doctor says, okay, I'm still going to prescribe Evandia, would argue that maybe the 11th Circuit, although it went further, I agree, might be right in saying that doctors cut the causal chain. If doctors cut the causal chain, then warfarin doesn't make sense, because in warfarin the generics were out there. I understand, albeit warfarin was the antitrust. And then I go back to the argument that you would have to find a statutory distinction in the nature of proximate cause between rico and antitrust. And everything from the Supreme Court says the contrary. And there's also a line of cases from this court, including most recently Delrico Mochi v. Connolly, which says that rico and antitrust draw from a common well in terms of the definition of standing and causation. So I think that this court would have to venture on a definition of rico injury that would have to depart from the statutory text if we assume, as the Supreme Court did, that the statutory text was inherited knowingly from the antitrust context.  Mr. Bosner. I'd like to make two points to the court. The first is that if the plaintiff's approach here is accepted, that the nondisclosure of an unmanifested risk creates injury that would give rise to a rico claim, you're opening the door to rico claims with respect to every drug that comes on the market. When a drug is introduced, it's gone through a very rigorous process before the Food and Drug Administration. But invariably, as the drug is out there for a while, studies indicate that there's a potential of certain risks. No, but there's an add-on here, is that there have been claims that there were significant misrepresentations, warnings that were continued over the course of years that the FDA required, and ultimately studies done that showed that there were problems, there were health-related problems. And the claim was that instead of, in effect, acquiescing to doing something to deal with that, took a very strong stance that, you know, these studies are wrong, and kept on going with regard to these so-called misrepresentations. I assume for the moment you don't agree with any of the claims that there are misrepresentations. In that context, this is a different case, isn't it? No, it isn't, Your Honor, because what the company was saying, I mean, the Food and Drug Administration, when it's not sure, puts out warnings on products. And you go through a long debate process on that issue, which is what happened here. And the warnings that it put on the product, asked to be put on the product in November 2007, in November 2013, after all of this got sorted out, they told the company to take them off. The company's position was that these studies are inaccurate, and ultimately the FDA said, you're right. And so we're back where we are at the beginning. But there was a settlement, was there not? What's that? There was a settlement, was there not? Not on this issue, no. What we're talking about is whether the allegations about the safety of the product, whether these warnings were appropriate. And the FDA ultimately said it was not. So what you're inviting, where there's this unmanifested risk of the sort that was talked about in Mayo, is the courts getting in the middle of this process, suggesting that there's injury where. Courts only get in the middle of the process when somebody brings a case before them. But that's what's being invited here. And that's what happened in the Second Circuit, that's what happened in the First Circuit, and that's what happened in the Eleventh Circuit. And that's what's being invited here, and the sort of thing that Mayo was warning, that you shouldn't allow RICO to become a treble damages claim for any sort of claim that may come along. And that's the problem with the injury analysis here, is that it invites that with respect to every drug when a risk issue comes along. I mean, the irony here is the court said, the district court said, you got what you paid for, so I'm dismissing the unjust enrichment claim, but we're leaving on the books here for further litigation the treble damages claim. And the other irony is Actos, the alternative drug that everyone was supposed to go to, is now the subject of an MDL proceeding, where undisclosed risks are being debated there as well. And that's the problem with going down this path. One other thing I would mention, Your Honor, in the second point that I wanted to offer was- Well, I mean, look, looking at life from 50,000 feet, the good thing about going down this path is that patients, all of us in this room, who might be prescribed a particular medication, want to know and don't want that medication to have health risks, in addition to the ones that you already know about at the outset. Your Honor, that is correct, and that's why the Food and Drug Administration there is to referee that. But should juries be the one who are making that determination with these RICO claims? That's what a lot of these cases are saying you shouldn't get into. The FDA, to my knowledge, doesn't really do its own research. It relies on studies paid for by- No, it mandates that these studies be done, or it believes that they're being warranted. They may be paid for by different resources, but they mandate independent studies on these issues. And, Your Honor, it's just like in Mayo, the same concern the court had there. Do you really want to get the courts in the middle of doing that medical analysis, which is what you required? The court there was very concerned about, do you want the courts in the middle of figuring out how health care should be provided? And that's the same issue that you have here, and that's what this unmanifested risk is saying. Our theory of this is that if the drug is inefficacious, or if it causes injury, sure, there should be lawsuits about that. Let's circle back to where you and I started at the beginning. I said, if someone is injured, and assume for the moment that there were a misrepresentation, who would be the direct victim? And you said it would be consumers and possibly, in some instances, third-party payers. That was your response. If Mr. Zakharoff were representing consumers, is there any question that they pass the proximate causation test? Your Honor, in this case, I don't think that they do pass the proximate cause test. And I think this is especially true, and Judge Roth, I wanted to come back, because of the clarification that counsel made here, is that they're really, as I understand it, not pressing a case that concerns overpricing, as much as they're talking about quantity. And if you talk about proximate cause there, Your Honor, and you think about Holmes addressing the difficulty of sorting it out here, that means that if this proceeds, the causation link is very long. You would have to look at every prescription that was written. And if the physicians, if the analysis, the physician would have written Actos, counsel is conceding there's no injury from that. But some physicians, with this additional risk information, would have said metformin is not effective for my patient. I'm going to write, I'm looking at what the Evandia risks are, but I have to take them for the benefit of my client. That sounds like an issue for trial or maybe summary judgment, but not to OB-6. No, Your Honor. In these cases, that is proximate cause. That is the sort of proximate cause that has been dealt with, the motion to dismiss stage in a number of the cases that we've cited in that section. So you could be a direct victim as a patient and you don't have an action? Your Honor, we're saying that under RICO you don't have the action because there is not a, the proximate causation link is too long. So who does have the action? Well, the action, if, what I'm talking about is with the TPPs here. To prove this collectively. Who would have an action under RICO? Well, I don't think that absent the injury analysis that we advanced here, you're having a patient come in and say, I wasn't injured. That's the problem with this. I didn't suffer an injury. This is like Rivera in the Fifth Circuit. If the patient, if there is a, as a result of taking a Vandia, a person who develops whatever it might be, heart problems, whatever, and they're saying that that's traceable to a Vandia, you're saying they're not injured? Oh, Your Honor, but that's not our case here. There is no allegation of injury here. This is like the Brielle case. I bought a product. There was a risk associated with it, but the claimants that we're talking about here, if you're talking about individual claimants, yes, if they were injured by the product, they have a lawsuit. I'm not debating that at all. So, in effect, you're saying that they also don't have a cause of action with regard to state law consumer law protection? No, Your Honor, they don't, because there was no injury. That's the Brielle line of cases that Mayo relied upon earlier. You have people coming in and they're saying, nothing happened to me. I bought the product. What about somebody who comes in and says, something happened to me? They have a claim. I'm not, we're not debating that. But this case is about individuals, if you want to put it in the consumer category, who bought the product, who got what they paid for. The trial court said that. They got efficacious relief from a vendia, and they suffered no personal injury. And so they're suing about a possible risk that was not manifested as to them. Under Rivera, there's no standing. Under Brielle, which Mayo relied upon principally, there's no cause of action. That's the problem with the case. It's all about unmanifested risk. Something could have happened to me, but it didn't. I don't have a lawsuit in that circumstance. That's what they're arguing. So you're saying that third-party payers shouldn't receive anything for the person who was helped by a vendia and didn't have any type of additional complication as a result of taking it? That's what we're saying. So how do you define property in the RICO context here? Define property? Is it the risk? It's the... I think that's what they have to be saying is that it's... Your opponents say it was the money that was paid out. I mean, that is their theory on that. I assume that's, I mean, that's their contention on this. But there really isn't injury to the property here, which is the pharmaceutical product that was purchased, because it was what it was supposed to be. That's what the district court found. Thank you. And I'd like to ask counsel if you would get together with the clerk's office and have a transcript prepared of this whole argument. Thanks to both of you for very well presented arguments. Thank you, Your Honor.